# EXHIBIT 2-3

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEVEN J. BENNETT,     )  CIVIL ACTION - LAW
                    )
        Plaintiff   )
                    )
-vs-              )
                    )
TROOPER JAIME LOPEZ    )
and TROOPER GABRIEL L.  )
PADUCK,             )
                    )
        Defendants  x  No. 3:17-cv-02031-ARC

------------------------

DEPOSITION TESTIMONY OF

**TROOPER JAIME LOPEZ**

FRIDAY, MARCH 1, 2019

OFFICE OF THE ATTORNEY GENERAL
417 LACKAWANNA AVENUE - SUITE 203
SCRANTON, PENNSYLVANIA

TERESA A. CROSSIN, RMR
NOTARY PUBLIC

**KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PA  18507
(570) 558-3011     (800) 570-3773
FAX  (570) 558-3014**



2

**COUNSEL PRESENT:**

**On behalf of the Plaintiff:**
        LAMPMAN LAW
        BY:  LEONARD GRYSKEWICZ, JR., ESQ.
        2 Public Square
        Wilkes-Barre, PA 18701

**On behalf of the Defendant Lopez:**
        HARRY T. COLEMAN, ESQ.
        41 North Main Street
        Carbondale, PA 18407

**On behalf of the Defendant Paduck:**
        PENNSYLVANIA STATE POLICE
        BY:  ANDREW M. RONGAUS, Asst. Gen. Counsel
        Office of Chief Counsel
        1800 Elmerton Avenue
        Harrisburg, PA 17110

### STIPULATIONS

    It was stipulated and agreed by and between
counsel that the reading, signing, sealing and filing
of the deposition transcript be waived.
    It was further agreed that all objections except
as to the form of the question will be reserved until
the time of trial.

### INDEX OF WITNESSES

EXAMINATION                                    PAGE NUMBER
TROOPER JAIME LOPEZ
By Mr. Gryskewicz. . . . . . . . . . . . . . . .3

3

1    **T R O O P E R        J A I M E        L O P E Z,**

2    WAS CALLED, AND HAVING BEEN DULY SWORN,

3    WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4

5    **EXAMINATION BY MR. GRYSKEWICZ:**

6         Q.    Trooper Lopez, my name is Lenny

7    Gryskewicz.  I represent Mr. Bennett in this action.

8               Have you ever been deposed before?

9         A.    Yes, I have.

10        Q.    Okay.  I am going to give you a quick

11   rundown of some rules.  I am sure you learned them

12   last time and your attorney already explained them to

13   you.

14               So, I will be asking you questions

15   regarding, you know, the basis of this action, an

16   incident that took place in Judge Plummer's

17   Magisterial District Court on May 12, 2017.

18               My intent is not to annoy you or harass

19   you or embarrass you with my questions, simply to

20   learn what you know about this case.  I am sure in

21   the course of this deposition I am going to ask you a

22   bad question, something that's not worded right.  If

23   you don't understand a question I ask you, just let

24   me know, I will rephrase the question or withdraw the

25   question.

**KEYSTONE COURT REPORTING AGENCY, INC.**

4

1          If you could please give verbal answers

2     to the questions.  I will know what you mean if you

3     nod your head, but the stenographer will need a

4     verbal answer to build the transcript here.

5          I would ask that you would wait until I

6     am finished asking the question before you provide

7     the answer.  The stenographer, as skilled as she is,

8     can't write down both of our responses at the same

9     time.  I will provide you the same courtesy, sir, and

10    wait until you are finished answering to ask my next

11    question.

12          If you need a break at any point,

13    please, just let me know.  I would just ask that you

14    answer any question that is currently posed to you

15    before we take a break.  But if you need a break,

16    just let me know.

17          Do you have any questions about that?

18         A.    I do not have any questions.  Thank

19    you.

20         Q.    Okay.  What is the highest level of

21    education you have attained?

22         A.    I completed about three years of

23    college.

24         Q.    Okay.  Did you get an Associate's

25    degree or Bachelor's degree from that?

5

1          A.     Neither.

2          Q.     Okay.  What did you do for employment

3    before you became a police officer?

4          A.     Most recently before becoming a police

5    officer, I was employed as a security guard and a

6    medical first responder for the Woodloch Pines Resort

7    in Pike County.

8          Q.     Okay.  When did you first become a

9    police officer?

10         A.     September 25, 1995.

11         Q.     Okay.  And were you -- did you become a

12   State Trooper then?

13         A.     Yes, sir.

14         Q.     So, did you graduate the State Police

15   Academy at that time?

16         A.     Yes, sir.

17         Q.     Where did you go to the State Police

18   Academy at?

19         A.     At the State Police Academy in Hershey,

20   Pennsylvania.

21         Q.     Could you describe the training that

22   you underwent at the academy?

23         A.     It was a six-month training program, at

24   that time standard for any cadet seeking employment

25   as a Pennsylvania State Trooper who was appointed as

1   a cadet to the program.  And it consisted of an array

2   of education, including use of force, training in

3   understanding and enforcing vehicle code violations,

4   crime code violations, interpretations of the law.

5   It involved calisthenics, weight training, swimming.

6   I would have to say it was probably very similar to a

7   much shorter version of what military people go

8   through.

9          Q.     Okay.  Do you have requirements to

10  undergo new training every year as a State Trooper?

11         A.     Yes.

12         Q.     Could you tell me about those?

13         A.     Typically, one that jumps out in my

14  mind is what is called legal updates training.  As

15  time progresses, it is not unusual for laws to vary

16  slightly or new laws to be enacted.  And those that

17  affect the performance of my job or a police

18  officer's job have to be made available to us and we

19  have to be subjected to what those new laws are.

20                I am also during that training tasked

21  with demonstrating proficient use of the taser,

22  hand-to-hand combat, firearms proficiency.

23         Q.     Okay.  And is that training yearly that

24  you have to undergo?

25         A.     Annually.

7

1       Q.      Annually, okay.  And is it the same

2   every year, legal updates, firearms training, et

3   cetera, or is it different every year?

4       A.      The attendance for mandatory update

5   training occurs every year.  The content of that

6   training will vary slightly depending upon the new

7   laws that I am being subjected to.

8       Q.      Understood.  When was the last time you

9   underwent this annual training?

10      A.      We actually just did an online version

11  of that training and I just completed that, I would

12  say, within the last three months.

13      Q.      Okay.  When was the last time you

14  completed that training before May 12th of 2017, if

15  you remember?

16      A.      My memory would not serve me to provide

17  an accurate answer.

18      Q.      Okay.

19      A.      But suffice it to say I know from, now,

20  23 years on the job I would have been subjected to

21  that training.

22      Q.      Absolutely.  And you wouldn't have been

23  a State Trooper on May 12th if you didn't do that

24  training, right?

25      A.      Or would not have been certified to do

**KEYSTONE COURT REPORTING AGENCY, INC.**

8

1    the job.

2          Q.    Okay.  How long were you stationed in

3    Troop P in Tunkhannock?

4          A.    I have always been a member of Troop P

5    since I started with the Pennsylvania State Police up

6    to that point in time, probably since 2011.

7          Q.    Okay.

8          A.    As memory serves me.

9          Q.    How long did you work with Trooper

10   Gabriel Paduck?

11         A.    Trooper Gabriel Paduck and I were

12   partners for about a year, as I could remember.

13         Q.    And was that one year prior to May 12th

14   of 2017 or one year from today?

15         A.    With that follow-up question, I think

16   the accurate answer would be, in total, for about a

17   year.

18         Q.    Okay.  And do you remember what year it

19   was when you first met Mr. Paduck, Trooper Paduck?

20         A.    Probably -- this incident happened in

21   March of 2017, so it would have to have been 2016

22   that I met him.

23         Q.    Okay.  And were you always assigned to

24   be partners with Trooper Paduck?

25         A.    Trooper Paduck and I became midnight

1    partners; so, yes, we were routinely assigned to the

2    routine midnight shift, but it would not have been

3    unusual or uncommon for if either I or Trooper Paduck

4    was not working a particular midnight shift that we

5    would be paired up with someone else.

6          Q.    Understood.  Were you ever involved in

7    a lawsuit, not counting this one?

8          A.    I was never mentioned as a party in a

9    lawsuit.

10         Q.    Okay.  So, you were never a Plaintiff

11   or a Defendant in a lawsuit before, is that fair to

12   say?

13         A.    That's fair to say.

14         Q.    Okay.  Could you tell me what you were

15   deposed for then previously?

16         A.    Once I was a Trooper in Sullivan

17   County, perhaps, maybe in the late '90s and I was

18   deposed for a crash investigation I conducted where

19   there were two parties, two opposing parties.  I had

20   to go down to Lycoming County, Williamsport, and

21   provide a deposition in that civil case.

22         Q.    So, would it be fair to say it was a

23   personal injury action between two parties and you

24   were just a witness that was deposed?

25         A.    In that particular case, yes.

**KEYSTONE COURT REPORTING AGENCY, INC.**

1          Q.      Okay.  How many times do you estimate

2    that you were in Judge Plummer's courtroom before May

3    12, 2017?

4          A.      I am going to answer with the

5    consideration that Judge Plummer also had another

6    office out in Factoryville.

7          Q.      So, let me withdraw that question and

8    then reask it.

9                  How many times do you estimate you were

10   in Judge Plummer's courtroom at Hollow Creek by the

11   Pennsylvania State Police barracks in Tunkhannock?

12         A.      With respect to while Judge Plummer

13   presided over that office, I could not accurately

14   give you a number.  It is fair to say it was easily

15   over 50 times.

16         Q.      Okay.  So, it was many times?

17         A.      Oh, yes; too many to count.

18         Q.      Did you ever meet Steven Bennett prior

19   to May 12, 2017?

20         A.      I have not.

21         Q.      When did you arrive at the Tunkhannock

22   PSP barracks on May 12, 2017?

23         A.      On that night, I was called in earlier

24   than my normal scheduled start time for the midnight

25   shift because of an incident that was pending and had

11

1    depleted the resources of the p.m. shift.  I arrived

2    at the barracks somewhere between 8:00 and 9:00 p.m.

3    on that day.

4            Q.    What was your normal start time?

5            A.    2200 hours, also known as 10:00 p.m.

6            Q.    And did you have off on May 11th or did

7    you work the day before?

8            A.    As memory serves me, I worked the day

9    before.

10           Q.    Okay.  And would it have been the same

11   midnight shift, 10:00 p.m. to 7:00?  Or if that's

12   wrong, tell me what time it was.

13           A.    I can't answer with 100 percent

14   certainty, but it is highly likely I was scheduled a

15   midnight shift prior --

16           Q.    Okay.

17           A.    -- and coming in for a midnight shift

18   that night, as well.

19           Q.    Could you describe your normal work

20   schedule to me around May 12, 2017?

21           A.    As a permanent midnight Trooper, it is

22   typical that we would work a ten-day stretch.  After

23   coming in from a weekend off that ten-day stretch

24   would begin by, perhaps, maybe working a p.m. shift,

25   returning the next day on a day shift, returning the

**KEYSTONE COURT REPORTING AGENCY, INC.**

12

1   third day on a day shift but, yet, returning that

2   same on that third day at 10:00 p.m. to begin a

3   series of seven midnight shifts.

4          Q.     Okay.  Do you remember how many days

5   you worked in a row prior to May 12, 2017?

6          A.     I do not.

7          Q.     Okay.  And I don't believe I said this

8   in my instructions, but if I don't know is an answer

9   to a question, it is a perfectly acceptable answer.

10                So, what were you doing before you got

11  called in to work?

12         A.     I was actually returning home with a

13  takeout order of food.

14         Q.     Okay.  And where do you live at, sir?

15         A.     Laceyville, Pennsylvania, in Wyoming

16  County.

17         Q.     About how far is that from the

18  barracks?

19         A.     About 13 miles.

20         Q.     Did you have anything to drink before

21  you went in to work?

22         A.     If you are referring to alcoholic

23  beverages, no, I did not.

24         Q.     Okay.  To your knowledge, was any force

25  required to place Mr. Bennett under arrest on May 12,

**KEYSTONE COURT REPORTING AGENCY, INC.**

1    2017?

2         A.    To my knowledge, I am not aware of if

3    any force was necessary.

4         Q.    Okay.  And you would agree that Mr.

5    Bennett was already in police custody when you

6    arrived at the State Police barracks that night?

7         A.    Yes, I would agree.

8         Q.    Okay.  And could you tell me where Mr.

9    Bennett was located when you first came into the

10   barracks that night?

11        A.    He was located in a room that is known

12   to us as the patrol room and he was actually situated

13   upon the prisoner bench fastened to the same.

14        Q.    Why is that room known as the patrol

15   room?

16        A.    That is where those Troopers who are

17   assigned to the patrol section out of the Tunkhannock

18   barracks typically conduct their business.

19        Q.    Okay.  And is that normally where you

20   would keep a prisoner or somebody in custody?

21        A.    That is normally where we would keep

22   somebody in custody, yes.

23        Q.    Okay.  Do you remember how Mr. Bennett

24   was restrained when you arrived at the barracks?

25        A.    To my recollection, he was seated down,

**KEYSTONE COURT REPORTING AGENCY, INC.**

14

1  handcuffed to his front, and those same handcuffs

2  were also attached to an ankle set of cuffs affixed

3  to the floor; thereby, he was unable to stand up.

4          Q.    Okay.  And did there come a point when

5  you and Trooper Paduck were asked to escort Mr.

6  Bennett to his preliminary arraignment?

7          A.    Yes.

8          Q.    Okay.  And did you have to change Mr.

9  Bennett's restraints prior to transporting him to

10  that?

11         A.    Somewhat so, yes.

12         Q.    Okay.  Did you do that personally?

13         A.    I can't recall with 100 percent

14  certainty, but it stands to reason that myself, in

15  conjunction with the Trooper working with me, would

16  have prepared Mr. Bennett for the next phase of his

17  transport or custody, yes.

18         Q.    Okay.  And it was only yourself,

19  Trooper Paduck and Trooper Levanavage at the barracks

20  at that time, right?

21         A.    When we were preparing him for

22  transport to Plummer's office, yes.

23         Q.    So, would it have been the three of you

24  working in conjunction to change Mr. Bennett's

25  restraints?

**KEYSTONE COURT REPORTING AGENCY, INC.**

15

1      A.      It could have been, if that's an

2  acceptable answer.  If you need me to explain, I

3  could.

4      Q.      Yeah, if you could explain.

5      A.      It is a subject in custody who is being

6  prepared for transport.  For safety reasons, there

7  should be at least two officers present.  I know by

8  recollection that both Paduck and I were present.

9  Whether or not Trooper Levanavage actively engaged in

10  any part of assisting the affixing of the transport

11  belt to Mr. Bennett and the subsequent affixing of

12  his handcuffs to that transport belt I can't recall

13  with 100 percent certainty.

14      Q.      Okay.

15      A.      I did not do it alone.

16      Q.      Okay.  And could you tell me how Mr.

17  Bennett was restrained when you transported him?

18      A.      He would have had a leather transport

19  belt affixed about his waist with a metal ring that

20  is present on the front portion of that belt about

21  where his naval is.  And those handcuffs that he was

22  wearing about his hands would have momentarily been

23  -- one cuff would have been taken off, that same cuff

24  would have passed through that D-ring and the chain

25  would have went through that D-ring.  That loose

1   handcuff would have been reaffixed to Mr. Bennett's

2   free wrist.

3       Q.     And with the transportation belt, is

4   that the normal way that the State Police would

5   transport somebody?

6       A.     Yes.

7       Q.     Is there ever a time with State Police

8   transport individuals have their hands handcuffed

9   behind their back?

10      A.     Yes, there most certainly is.

11      Q.     Could you tell me why you would pick

12  handcuffing somebody behind their back versus using

13  the transport belt?

14      A.     Upon first coming into contact with

15  somebody whom you deem you are going to be taking

16  into custody, the transport belt is not always

17  readily available; however, handcuffs normally are.

18  And when we transport somebody in handcuffs, absent

19  certain circumstances or reasons to justify placing

20  those handcuffs in front, not only is it required but

21  the preferred method is to handcuff that person

22  behind their back.

23      Q.     Okay.  And then was Mr. Bennett

24  restrained with the transport belt from the time you

25  left the Pennsylvania State Police barracks until he

1    was lodged at the Wyoming County Prison?

2         A.    Could you repeat that question?

3         Q.    Yes.  Was Mr. Bennett restrained with

4    the transport belt and the handcuffs through that

5    transport belt the entire time from when you left the

6    Pennsylvania State Police barracks until he was

7    lodged at the Wyoming County Prison later that night?

8         A.    That would have been the intention.

9    But I can't say with 100 percent certainty that he

10   was transported that way and here is why.

11        Q.    Okay.

12        A.    There came a point in time prior to him

13   going to jail that he had to visit the hospital.

14   There came a point in time before visiting the

15   hospital that he had to be assessed by ambulance

16   personnel.  So, it would not have been unusual that I

17   would have or one of us would have modified the

18   manner in which he was transported to accommodate his

19   medical treatment.

20        Q.    Okay.  So, it is possible that he might

21   have been un-handcuffed or the restraints would have

22   been otherwise altered when he was being treated by

23   medical personnel that night, is that correct?

24        A.    That's correct.

25        Q.    Besides when he was being treated by

18

1    medical personnel, do you recall any other time that

2    his restraints were changed?

3         A.    I don't.

4         Q.    How were you, Mr. Bennett, and Trooper

5    Paduck arranged in the police vehicle when you were

6    traveling to the arraignment?

7         A.    By my recollection, I was operating the

8    patrol vehicle that evening, so, that would have

9    situated me in front behind the steering wheel.  Mr.

10   Bennett would have been in the back.  And because of

11   Mr. Bennett's size and because of Trooper Paduck's

12   size, the most comfortable transportation

13   arrangements would have put Trooper Paduck in the

14   front passenger seat.

15        Q.    Would you agree that while you were

16   transporting Mr. Bennett to his preliminary

17   arraignment that you did not have any problems with

18   him?

19        A.    I would agree, I recall that.

20        Q.    Would you agree that you had no

21   problems with Mr. Bennett while you were escorting

22   him into Judge Plummer's courtroom?

23        A.    I would agree.

24        Q.    When you entered the courtroom with Mr.

25   Bennett and Trooper Paduck, where did the three of

1   you take seats?

2        A.    The entire time prior to the

3   proceedings but, yet, while we were in the courtroom,

4   there was a bunch of -- there was an assortment of

5   manner in which we were either standing or seated.

6   But there is, by default, a prosecution side and a

7   Defendant side.  When we were seated, it is fair to

8   say that Trooper Paduck and I were on the prosecution

9   side of the courtroom and Mr. Bennett was seated at

10  the Defendant's table.

11       Q.    Okay.  And were you and Trooper Paduck

12  seated at the prosecution table or in the seats

13  behind there?

14       A.    As memory serves me, I was seated in

15  the seats behind the prosecution table, Trooper

16  Paduck, there was a portion of time when he was

17  seated at the prosecution table, and I think that

18  answers your question.

19       Q.    Yes.  At some point before Judge

20  Plummer came out into the courtroom, you went back

21  into the Judge's chambers, is that right?

22       A.    That's right.

23       Q.    What did you discuss with Judge Plummer

24  when you went back into his chambers?

25       A.    I cannot recall what we discussed, but

20

1    I would not have gone there to engage him on

2    conversation of my choosing, I more than likely

3    responded to his request for me to come back there.

4         Q.    Understood.  So, you wouldn't have went

5    back into Judge Plummer's office unless he gave you

6    permission to or requested your assistance?

7         A.    Most certainly.

8         Q.    Where were you seated when Judge

9    Plummer came out of his office to begin the

10   arraignment?

11        A.    As memory serves me, it would have been

12   at the seats behind the prosecution table.

13        Q.    Okay.  And do you remember where

14   Trooper Paduck was seated at that same time?

15        A.    By recollection, I believe he was at

16   the prosecutor's table.

17        Q.    For a time during the arraignment, you

18   and Trooper Paduck were standing off on the

19   prosecution side of the room while Judge Plummer

20   handed Mr. Bennett paperwork; would you agree with

21   that?

22        A.    Could I ask you to repeat the question?

23        Q.    Yes, absolutely.  For a time during the

24   arraignment, so, after Judge Plummer came out of his

25   office, you and Trooper Paduck were standing on the

1   prosecution side of the room while Judge Plummer

2   handed Mr. Bennett paperwork at the Defendant's

3   table, is that right?

4         A.    Yes.

5         Q.    Okay.  And then during that time, is

6   that when Mr. Bennett began to ask Judge Plummer

7   questions?

8         A.    In part, the answer to that is yes, but

9   that is not the only time Mr. Bennett had interrupted

10  the proceedings with questions to Judge Plummer.

11        Q.    Okay.  Do you remember what sort of

12  questions Mr. Bennett was directing towards Judge

13  Plummer?

14        A.    Mr. Bennett was interested and had

15  asked Judge Plummer if he could obtain a PFA against

16  his alleged victim that night.

17        Q.    And do you remember how Judge Plummer

18  responded to Mr. Bennett?

19        A.    My recollection is simply by telling

20  Mr. Bennett that he can go to the courthouse on

21  Monday and apply at the Prothonotary's office.

22        Q.    How would you characterize the

23  interactions between Judge Plummer and Mr. Bennett?

24        A.    I would characterize the interaction

25  between those two as typical but it was changing.  As

22

1    the proceedings went on, the interaction between the

2    two changed.

3        Q.    And during the arraignment, you would

4    agree that Mr. Bennett stood up at one point while he

5    was talking with Judge Plummer, is that right?

6        A.    Yeah, definitely, I remember that.

7        Q.    And at that time do you remember

8    Trooper Paduck approaching Mr. Bennett and standing

9    next to him?

10       A.    I actually remember myself doing that,

11   going and standing next to Mr. Bennett.

12       Q.    Do you ever remember Trooper Paduck

13   standing next to Mr. Bennett?

14       A.    Yes.

15       Q.    And do you remember if that was before

16   or after you were standing next to Mr. Bennett?

17       A.    I think there came a point in time when

18   Trooper Paduck was standing first and then there came

19   a point in time where I motioned, I moved towards

20   standing closer to Bennett and the Judge.

21       Q.    Okay.  And then after Mr. Bennett was

22   standing talking to the Judge for a time, he sat down

23   in his chair, correct?

24       A.    I remember that actually happening,

25   yes.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

23

1      Q.      And then do you remember Mr. Bennett

2   leaning forward in the chair while he was talking to

3   the Judge about something to do with the paperwork?

4      A.      Yes.

5      Q.      And is that when you placed your left

6   hand on his shoulder?

7      A.      A simple answer to that is, yes, but

8   there came more than one point in time where Mr.

9   Bennett moved closer toward the Judge.

10     Q.      Okay.  Could you describe that to the

11  best of your recollection, sir?

12     A.      Okay.  I will attempt.  I know that

13  there is video of this interaction.

14     Q.      Yes, sir.

15     A.      So, it would be nice if we had the

16  video so that I can narrate what is going on and from

17  my recollection.  But you are asking me to describe

18  how it was that I am able to say Mr. Bennett moved

19  forward on more than one occasion toward the Judge?

20     Q.      Yes, sir, from your memory.

21     A.      So, there was an interaction where,

22  overall, the Judge is going through the proceedings,

23  the preliminary arraignment proceedings.  There is

24  dissatisfaction between what Magistrate Plummer is

25  articulating and what Mr. Bennett appears to be

24

1  hearing or gleaning from the same.  There is moments

2  in time where Mr. Bennett is pushing himself

3  backwards away from the Defendant's table and moments

4  in time when he is inching forward towards the

5  prosecutor's table.  So, when I say that I observed

6  that, it's because that is what I observed.

7       Q.    Why didn't you place your hand on Mr.

8  Bennett's shoulder when he was leaning forward in the

9  chair previously?

10      A.    Because that definitive line in the

11 sand whereby Magistrate Plummer has now -- has

12 eventually articulated Mr. Bennett is not going to

13 sign the bail paperwork had not occurred yet.

14      Q.    And you would agree with me that Mr.

15 Bennett was standing up and arguing with Judge

16 Plummer prior to you placing your hand on his

17 shoulder?

18      A.    Yes.

19      Q.    Why didn't you restrain Mr. Bennett,

20 put him back in his chair when he stood up prior to

21 you putting your hand on his shoulder?

22      A.    For reasons that I cannot articulate

23 any better than simply to say I didn't.

24      Q.    Okay.  After you placed your left hand

25 on Mr. Bennett's shoulder, you then placed your right

**KEYSTONE COURT REPORTING AGENCY, INC.**

1    hand on his shoulder and chest area, is that right?

2         A.    That's right.

3         Q.    And could you tell me why you did that,

4    sir?

5         A.    Because in the course of my putting my

6    one hand upon Mr. Bennett's right shoulder, I think

7    you just described?

8         Q.    Yes.

9         A.    My left arm out on his right shoulder,

10   he was not heeding my command to stop, don't come any

11   closer, requiring a more -- an increase in the amount

12   of force I utilized or needed to stop him from coming

13   closer.

14        Q.    Do you remember how many times you told

15   Mr. Bennett to stop moving closer?

16        A.    Suffice it to say more than once.

17        Q.    Do you remember if you told him to stop

18   moving forward prior to placing your left hand on

19   him?

20        A.    I don't recall.  It could have

21   happened; I don't recall.  It might have been

22   simultaneous when I said -- when I placed my arm on

23   him, it might have been simultaneous that I said

24   don't come any closer.

25        Q.    Okay.  When you had both of your hands

26

1    on Mr. Bennett's shoulder area, could you describe

2    what type of force you were applying?

3          A.      Restraining force.

4          Q.      Okay.  So, were you pushing Mr. Bennett

5    back with your hands at that point?

6          A.      The restraining force I applied was a

7    combination of stopping him and pushing him from

8    coming any closer.

9          Q.      And is restraining force a term of art

10   that police use?

11         A.      A term of art, I have never heard it

12   referred to as a term of art.  It is a term that we

13   use in our training.

14         Q.      So, let me rephrase that question.

15                 Does restraining force mean something

16   specific to you?

17         A.      Yes.

18         Q.      Could you describe what it means?

19         A.      Restraining force is a lower level of

20   force that is authorized to be used to accomplish an

21   objective, a lawful objective by a police officer.

22         Q.      After you put both of your hands on Mr.

23   Bennett's shoulder, would you agree that Mr. Bennett

24   then was looking at you or in your direction?

25         A.      I am sure there came a moment in time

**KEYSTONE COURT REPORTING AGENCY, INC.**

1  when Mr. Bennett was looking at me but I also know

2  there is video evidence of this moment in time.

3       Q.    And then after you had both of your

4  hands on Mr. Bennett's shoulder, at that point is

5  when you struck Mr. Bennett in the face, is that

6  correct?

7            MR. COLEMAN:  Note my objection.

8       You could answer, Trooper.

9            THE WITNESS:  There came a moment

10           in time after and while I was

11           restraining Mr. Bennett that I struck

12           Mr. Bennett.  But I think the proper

13           reasoning for it are best summed up by

14           me narrating the video as it is playing.

15  BY MR. GRYSKEWICZ:

16       Q.    I understand, sir.  I would ask you to

17  testify as best you can from your memory about it.

18  Do you remember how you struck Mr. Bennett in the

19  face?

20       A.    I do remember how I struck Mr. Bennett,

21  yes.

22       Q.    Could you describe that, sir?

23       A.    An open-handed strike with my right

24  hand about the left portion of his face or his cheek,

25  his left cheek.

**KEYSTONE COURT REPORTING AGENCY, INC.**

28

1    Q.    And would you agree with me that from

2  the time you originally placed your left hand on Mr.

3  Bennett's shoulder to the time that you struck him in

4  the face was seconds?

5    A.    Seconds, if not fractions of seconds,

6  yes.

7    Q.    Would you agree with me that after you

8  struck Mr. Bennett in the face there was a pause

9  before Mr. Bennett stood up?

10    A.    A brief pause, I would agree, yes.

11    Q.    And then after that brief pause, you

12  would you agree that Mr. Bennett then tried to stand

13  up in the chair?

14    A.    Yes.

15    Q.    And could you tell me what you did

16  next?

17    A.    In an attempt to prevent him from

18  getting any vantage or advantage point, I immediately

19  grabbed him about the upper portion of his chest with

20  my right arm intending to make him top heavy and take

21  him off balance.

22    Q.    Okay.  And I believe you did, in fact,

23  make him top heavy and take him off balance, is that

24  correct, Trooper?

25    A.    That is correct.

**KEYSTONE COURT REPORTING AGENCY, INC.**

1    Q.    And you described that your arm was in

2  his chest area, is that right?

3    A.    Upper portion of his chest, neck area.

4  I know it is characterized in the Complaint as a

5  choke hold.

6    Q.    Okay.  About how long in your

7  estimation do you believe you held Mr. Bennett in

8  this position with your arm around his neck and chest

9  area?

10   A.    Approximately, 23 seconds, because I am

11 able to assess that time because I, too, have looked

12 at the video multiple times.

13   Q.    So, that is based on you viewing the

14 video, the 23-second estimate, is that right?

15   A.    That's correct.

16   Q.    During that 23-second window, did Mr.

17 Bennett ever try to grab you with his hands?

18   A.    No.

19   Q.    During that 23-second window, did Mr.

20 Bennett ever try to kick you?

21   A.    No.

22   Q.    During that 23 seconds, did Mr. Bennett

23 ever try to bite you?

24   A.    No.

25   Q.    During that 23 seconds, did Mr. Bennett

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

30

1      try to assault you in any way?

2           A.    No.

3           Q.    You would agree that while your arm was

4      around Mr. Bennett's chest and neck area, Judge

5      Plummer stood calmly at the front of the table?

6                 MR. COLEMAN:  Note my objection.

7           You can answer.

8                 THE WITNESS:  I can't say he stood

9           calmly.

10     BY MR. GRYSKEWICZ:

11          Q.    Were you looking at Judge Plummer while

12     you were restraining Mr. Bennett?

13          A.    No.

14          Q.    So, would it be fair to say that you

15     are not sure what Judge Plummer was doing at the time

16     you were restraining Mr. Bennett?

17          A.    In those moments that I was restraining

18     Mr. Bennett about his neck, head area, upper chest

19     area, it is fair to say that I, other than peripheral

20     vision, I was not 100 percent concerned with what and

21     how Judge Plummer was standing.

22          Q.    While you were restraining Mr. Bennett,

23     would you agree that Trooper Paduck approached you

24     and stood behind you for a few moments?

25          A.    I know that to be true.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

1    Q.    Okay.  And do you know that to be true

2  because you watched the video or you remember it

3  realtime?

4    A.    Because I watched the video.

5    Q.    Okay.  And then would you agree with me

6  that then Trooper Paduck walked back to the front of

7  the Defendant's table where Judge Plummer was

8  standing?

9    A.    Yes.

10    Q.    And, again, do you know that to be true

11  because you watched the video or because of your

12  realtime recollection?

13    A.    Because I watched the video.

14    Q.    Okay.  And then you would agree with me

15  that Trooper Paduck then began shuffling or reading

16  papers at the front of the Defendant's table during

17  this time?

18    A.    Yes.

19    Q.    And, again, do you know that because

20  you watched the video or because of your realtime

21  recollection?

22    A.    Most certainly because I watched the

23  video.

24    Q.    Why did you decide to release Mr.

25  Bennett at the end of the 23 seconds?

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

32

1    A.    Because I got to that point where I

2    felt he was now complying with my order to calm down.

3    Q.    Okay.  And how many times do you think

4    you ordered Mr. Bennett to calm down while you were

5    restraining him?

6    A.    While I was restraining him, multiple

7    times.

8    Q.    After you released Mr. Bennett, you had

9    a verbal exchange with him, right?

10    A.    Yes.

11    Q.    Do you remember what was said during

12    that time?

13    A.    Not with 100 percent certainty, no, I

14    do not.

15    Q.    After that verbal exchange, you would

16    agree with me that you took your name tag off in the

17    courtroom?

18    A.    Yes.

19    Q.    And then you took the pin off the back

20    of that name tag, correct?

21    A.    Yes.

22    Q.    And then you put that pin in Mr.

23    Bennett's lap, correct?

24    A.    Not the pin but the name tag.

25    Q.    Yes, I misspoke.  You put the name tag

**KEYSTONE COURT REPORTING AGENCY, INC.**

1    in Mr. Bennett's lap?

2         A.    Yes.

3         Q.    Why did you do this, sir?

4         A.    He was requesting my name and badge

5    number.

6         Q.    Would you agree with me that you were

7    upset with Mr. Bennett at this point?

8         A.    No, I would not.

9         Q.    How would you describe your feelings at

10   this point?

11        A.    I was worked up, is how I would

12   describe my feelings.  I had just taken the physical

13   action of restraining a larger man who had not heeded

14   my command to not come any closer in a courtroom

15   during a courtroom proceeding.

16        Q.    So, would it be fair to say that your

17   adrenaline was certainly pumping at that point?

18        A.    That would be fair, yes.

19        Q.    Okay.  And after your use of force

20   against Mr. Bennett, did you examine him for any

21   injuries in the courtroom?

22        A.    I did not.

23        Q.    Do you remember if part of your

24   exchange with Mr. Bennett was you asking him if he

25   was injured?

**KEYSTONE COURT REPORTING AGENCY, INC.**

34

1        A.    I do recall that I said to Mr. Bennett

2  you are not hurt but that did not occur in the

3  courtroom, that actually occurred in the patrol car.

4        Q.    Yes.  In the parking lot?

5        A.    Yes.

6        Q.    But in the courtroom, do you remember

7  saying anything about Mr. Bennett being injured?

8        A.    No.

9        Q.    Then after this interaction and your

10  use of force, you then escorted Mr. Bennett out of

11  the courtroom, right?

12        A.    Yes.

13        Q.    And would you agree with me that Mr.

14  Bennett obeyed your command to stand up in his chair

15  when it was time to leave the courtroom?

16        A.    I wouldn't agree with you entirely.

17        Q.    Okay.  Could you explain why you agree

18  and disagree with me then, sir?

19        A.    I could.  If we were watching the video

20  right now, I think the video would support my

21  statement that Mr. Bennett did not obey my command to

22  turn around and let's go, let's proceed out of the

23  courtroom simply.  It required me to say it multiple

24  times.  Eventually, I wound up grabbing him about his

25  right arm and compelling him to walk out of the

35

1    courtroom.

2         Q.    Would you agree with me that Mr.

3    Bennett didn't resist you when you grabbed his arm to

4    turn him around and walk him out of the courtroom?

5         A.    I would agree with you, yes.

6         Q.    Okay.  Would you agree with me that Mr.

7    Bennett did not resist you while he was walking out

8    of the courtroom with you?

9         A.    I would agree with you that he did not

10   resist me while we were walking out, yes.

11        Q.    Okay.  And what is your normal

12   procedure for escorting individuals -- strike that.

13   Let me rephrase that.  That was confusing.

14              How were you normally positioned when

15   you are escorting a prisoner?

16        A.    Normally, either behind him grabbing

17   him by the belt or grabbing him by one of his arms

18   and walking him forward.

19        Q.    Okay.  And it would be common for you

20   to place at least a hand on the prisoner, right?

21        A.    It would be.

22        Q.    Okay.  And why do you do that, sir?

23        A.    To maintain prisoner control and

24   security.

25        Q.    Is that part of your training as a

**KEYSTONE COURT REPORTING AGENCY, INC.**

36

1    police officer?

2          A.    Yes, and part of our policy.

3          Q.    Okay.  And then at that time when you

4    were escorting Mr. Bennett out of the courtroom, you

5    were taking him to your patrol vehicle, right?

6          A.    I was.

7          Q.    Okay.  And you would agree with me that

8    you had your hand on Mr. Bennett's transport belt

9    when you were escorting him out of the courtroom?

10          A.    Yes.

11          Q.    At any point did you pull Mr. Bennett

12    back towards you by that waist belt?

13          A.    Yes.

14          Q.    Could you describe that interaction for

15    us, sir?

16          A.    Unfortunately, outside of the view of

17    the courtroom's camera, there came a point in time

18    where we had exited Judge Plummer's courtroom but,

19    yet, had not exited the building and had not yet

20    arrived inside the patrol car during which Mr.

21    Bennett was leading me like a larger man or like a

22    mule, he was pulling me along.  And I firmly planted

23    one of my feet down as I leaned back and pulled back

24    on the belt and told him to stop pulling me.

25          Q.    Okay.  And I have been in Judge

**KEYSTONE COURT REPORTING AGENCY, INC.**

37

1    Plummer's courtroom before, I think everybody here

2    has, but for the record, could you describe how Judge

3    Plummer's office looks when you exit the courtroom?

4              MR. COLEMAN:   His courtroom or his

5         office?

6    BY MR. GRYSKEWICZ:

7         Q.   The office.  So, I believe, from my

8    recollection, there is a courtroom and then his

9    office is outside and you have to go down a hallway.

10   If you could describe how it looks when you leave the

11   courtroom to the exit.

12        A.   When you leave Judge Plummer's

13   courtroom and that courtroom is now behind you, it is

14   best described as a foyer.  As you are approaching

15   the exit of the building, there are two meeting rooms

16   on the left.  There is a bathroom on the right and

17   then eventually there is a secured area or pane of

18   glass where his administrative staff would stand

19   during business hours or sit during business hours.

20   There is a door to the same.  There is a waiting area

21   for the public to sit and wait as they wait to go

22   into the courtroom.

23        Q.   Okay.  And do you know about where you

24   were in that area when you had to put your foot down,

25   as you described, and stop Mr. Bennett from going

38

1   forward?

2         A.      With 100 percent certainty, no.   It

3   could have been in the foyer between the bathroom and

4   the two meetings rooms where lawyers sometimes meet

5   with their clients.   It could have been in that

6   waiting area where the public stands and sits.   It

7   could have been just outside the building.

8         Q.      And do you remember how hard you had to

9   pull on Mr. Bennett's transport belt?

10         A.      There was no measurable amount of force

11   other than for me to say it was the force I use to

12   convey that message to stop pulling me.

13         Q.      Would it be fair to say that you

14   stopped Mr. Bennett in his tracks from going forward

15   any farther?

16         A.      Yes.

17         Q.      Where was your police cruiser

18   positioned in the parking lot outside of Judge

19   Plummer's office?

20         A.      In one of the parking stalls.

21         Q.      Could you estimate about how far of a

22   walk it was from the door exiting Judge Plummer's

23   office to where your police vehicle was parked?

24         A.      15 yards.

25         Q.      And then when you got to the police

39

1   cruiser, where did you place Mr. Bennett?

2        A.    I returned Mr. Bennett, along with

3   Trooper Paduck, to the rear of the patrol car, rear

4   passenger compartment and sat him in the same.

5        Q.    And do you remember if it was yourself

6   or Trooper Paduck that did that?

7        A.    It was a combined effort, is my best

8   recollection.

9        Q.    Okay.  Do you know about how far

10  Trooper Paduck was behind you and Mr. Bennett as you

11  were exiting the courtroom?

12       A.    No.

13       Q.    Once you positioned Mr. Bennett in the

14  police vehicle, is that when Mr. Bennett started to

15  complain that his jaw hurt?

16       A.    There was a series of events that

17  occurred rapidly; so, in the instant, no, that's not

18  when he complained his jaw hurt.

19       Q.    Okay.  So, when do you believe he first

20  began complaining that his jaw hurt?

21       A.    I don't recall him saying that his jaw

22  hurt.

23       Q.    Okay.  Do you remember about -- do you

24  know where Mr. Bennett was located when he began to

25  hyperventilate in the vehicle?

**KEYSTONE COURT REPORTING AGENCY, INC.**

40

1    A.    Still in the back passenger

2    compartment.

3         Q.    Do you know about how long he was

4    seated in the police vehicle before this began to

5    occur?

6         A.    Best described as instantly he started

7    to act up.

8         Q.    And you then called an ambulance at Mr.

9    Bennett's request, correct?

10        A.    My calling of the ambulance was not

11   instantly to Mr. Bennett's saying he wanted an

12   ambulance or saying he wanted to go to the hospital.

13   As my recollection serves me, he didn't ask for an

14   ambulance, he said he wanted to go to the hospital.

15        Q.    And as a State Trooper, do you ever

16   transport people to the hospital?

17        A.    That's not unusual, yes, we do.

18        Q.    You do.  So, what made you call the

19   ambulance this night then versus transporting him?

20        A.    That he was insistent on going to the

21   hospital and I said to him he wasn't hurt; so, now a

22   dialogue began between Mr. Bennett and I.

23        Q.    Okay.  And at Tyler Memorial Hospital

24   is very close to where Judge Plummer's office is,

25   right?

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

1    A.    Very.

2    Q.    So, is there a specific reason that you

3    decided to call an ambulance versus driving him to

4    the hospital yourself?

5    A.    Yes.

6    Q.    Could you tell me what that is?

7    A.    Yes.   In this interaction between the

8    man in custody, Mr. Bennett, and I, I perceived that

9    he was feigning injury.   And when I determined that

10   he was insistent on saying he was hurt, but, yet, I

11   was not seeing any injury upon him or seeing any

12   difficulty with any breathing, I did not see any

13   bleeding about him, if he was going to be that

14   insistent that he was hurt, I was not going to give

15   him the benefit of saying we transported him to the

16   hospital.   I made the determination to call an

17   ambulance and ambulance personnel to the scene to

18   assess him.

19   Q.    And do you remember if Trooper Paduck

20   placed a call to Corporal Mitchell after you exited

21   Judge Plummer's office but prior to you radioing for

22   the ambulance?

23   A.    I know Trooper Paduck and I agreed for

24   us to notify the duty corporal.   When that actually

25   took place, I cannot say with any certainty.   I know

**KEYSTONE COURT REPORTING AGENCY, INC.**

42

1    there has to be record of when that call occurred.

2         Q.    Okay.   During the MVR recording from

3    your police vehicle that you could be heard saying

4    Paduck is the hero two times, what did you mean by

5    that?

6         A.    I reviewed the documentation you are

7    referring to.   That captures a jovial moment between

8    my partner and I.

9         Q.    Okay.   Could you describe it for me --

10   let me strike that.

11              Was the jovial moment at that time you

12   said it?

13        A.    Yes, yes, it was.

14        Q.    So, could you describe to me why it was

15   a jovial moment for both of you?

16        A.    I know that there actually is

17   documentation and a time sequence when that moment

18   occurred, and as memory serves me, by this point in

19   time, ambulance personnel had already arrived,

20   ambulance personnel had already begun their

21   assessment of Mr. Bennett.   But, yes, Mr. Bennett was

22   not being transported to the hospital yet, so, there

23   came this moment in time, as memory serves me, as I

24   think about the documentation you are referring to,

25   that Trooper Paduck and I were able to talk about

1    what is about to happen next.  We were referring to

2    Mr. Bennett being taken to the hospital but Trooper

3    Lopez cannot go with Mr. Bennett, who is agitated by

4    my presence.  And I made reference or inference to

5    Trooper Paduck is the hero again, he gets to ride

6    with Mr. Bennett.

7          Q.     Understood.  And I know you referenced

8    that you removed yourself from the situation.  Do you

9    remember at what time you began to, you know,

10   separate yourself from Mr. Bennett?

11         A.     As ambulance personnel became more

12   involved and the need for Mr. Bennett to be assessed

13   by them, I was getting Mr. Bennett out of my patrol

14   car and that began my final interaction with Mr.

15   Bennett.

16         Q.     Okay.  Do you remember about how long

17   it took for the ambulance to arrive at Judge

18   Plummer's office?

19         A.     I know it did not take long.

20         Q.     Okay.  And do you remember what

21   happened once the ambulance did arrive?

22         A.     When the ambulance did arrive, they

23   began to exit their vehicle and began to ask what

24   happened.

25         Q.     Did you speak to the EMTs at all?

**KEYSTONE COURT REPORTING AGENCY, INC.**

44

1       A.      I am sure I did.

2       Q.      Okay.  Did you give them any

3   descriptions of what happened?

4       A.      I am sure I did.

5       Q.      And, to your knowledge, did Trooper

6   Paduck do that, as well?

7       A.      I am sure he did, to some extent, yes.

8       Q.      And, to your knowledge, did Mr. Bennett

9   do that, as well?

10      A.      He would have had to have interacted to

11  describe his injuries and his complaint.

12      Q.      And then did you follow the ambulance

13  to the hospital?

14      A.      I did.

15      Q.      And then at some point I believe the

16  reports reference that you, while Mr. Bennett was in

17  the hospital, that you went back to the State Trooper

18  barracks, is that correct?

19      A.      Yes.

20      Q.      Do you remember why you went back to

21  the barracks at that time?

22      A.      If memory serves me correct, I needed

23  to use the bathroom or I needed to get something, a

24  charger for my phone.  There was some reason why I

25  went to the barracks.  But I quickly returned back to

**KEYSTONE COURT REPORTING AGENCY, INC.**

45

1   the hospital.

2        Q.      And then did you just wait in the

3   parking lot for Trooper Paduck to exit with Mr.

4   Bennett?

5        A.      I actually entered the emergency room

6   and remained a distance away from the personnel who

7   were treating Mr. Paduck -- excuse me, Mr. Bennett.

8        Q.      Okay.   Would you agree that once the

9   ambulance arrived at Judge Plummer's office, you did

10  not have any other problems with Mr. Bennett?

11       A.      I did not.

12       Q.      Okay.   You served a PFA on Mr. Bennett

13  on May 13, 2017, is that right?

14       A.      At the early portion of the next shift

15  that Trooper Paduck and I worked, yes.

16       Q.      Could you tell me what part you played

17  in the serving of that PFA?

18       A.      I continued to be the senior officer,

19  senior Trooper in our little crew of Trooper Paduck

20  and I.  I made the determination that I still cannot

21  have any interaction with Mr. Bennett.  I requested

22  that we call the officers from Tunkhannock Borough to

23  see if they were available to assist us.  They were.

24  They accompanied us to Mr. Bennett's house.  I

25  remained in the State Police patrol vehicle as

**KEYSTONE COURT REPORTING AGENCY, INC.**

1    Trooper Paduck and whichever officer there was, I

2    believe it was Officer Bukavage, who proceeded to

3    serve the PFA.

4         Q.    Would you agree that there were no

5    problems with Mr. Bennett when the PFA was served?

6         A.    I don't believe there were.

7         Q.    But you weren't right there?

8         A.    I didn't go to the door.

9         Q.    Okay.  Understood.  And then at some

10   later point you were charged with summary harassment

11   based on your interactions from May 12, 2017, is that

12   right?

13              MR. COLEMAN:  Just note my

14         objection.  You can answer.

15              THE WITNESS:  That is correct.

16   BY MR. GRYSKEWICZ:

17         Q.    Do you know who recommended that you be

18   charged with harassment, sir?

19              MR. COLEMAN:  I would like a

20         continuing objection to all of these on

21         the harassment.

22              MR. GRYSKEWICZ:  Understood.

23              MR. COLEMAN:  You could answer.

24              THE WITNESS:  As far as I

25         understand, it was the State Attorney

47

1          General's office who said to my internal

2          affairs division to charge me.

3     BY MR. GRYSKEWICZ:

4          Q.    Okay.  And you were then subsequently

5     acquitted at the summary trial before a magisterial

6     judge, is that right?

7          A.    I know the term to be found not guilty.

8          Q.    Okay.  What was your status with the

9     Pennsylvania State Police from May 13, 2017, until

10    you were found not guilty?

11         A.    In the initial days, I was fully on

12    duty, no restricted duty.  But there came a point in

13    time in June where they placed me on restricted duty.

14         Q.    Okay.  And then after the not guilty

15    verdict, were you reinstated to full duty?

16         A.    Shortly thereafter.

17         Q.    Okay.  Do you remember about when your

18    reinstatement occurred?

19         A.    Give me a moment to reflect.  I believe

20    the summary trial occurred, perhaps, maybe March of

21    2018; so, it was shortly thereafter.

22         Q.    Okay.  Would you describe it as days,

23    weeks, months?

24         A.    Days.

25         Q.    Okay.  To your knowledge, now that you

1   have been found not guilty, will the Pennsylvania

2   State Police insurance policy cover any type of

3   monetary damages that you may be required to pay in

4   this case?

5          A.     I actually don't know the Pennsylvania

6   State Police's position on that.

7          Q.     Okay.

8          A.     I know that I am represented by counsel

9   at my expense.

10         Q.     Okay.  Sir, before I ask you these next

11  questions, I just wanted to give you a background why

12  I am asking them.  I am not asking them to harass you

13  or embarrass you, I am just asking because part of

14  the way punitive damages get calculated in a federal

15  lawsuit is based on a person's income.

16              So, I am going to ask you how much do

17  you make a year as a Pennsylvania State Trooper?

18         A.     I can only refer to my tax records.  I

19  don't know what the base salary of a Trooper with my

20  amount of years on the job is.  It is not something

21  that I am interested in anymore.  But, annually, my

22  tax records indicate that I take home somewhere

23  between 70- and $85,000.

24         Q.     Okay.  What do you estimate your total

25  net worth to be, sir?  I know that's a difficult

**KEYSTONE COURT REPORTING AGENCY, INC.**

1  question to answer, but if you could estimate to the

2  best of your ability.

3          A.    I will answer honestly, because I know

4  my personal situation.  My net worth is probably at

5  this juncture 90,000 a year income, gross income,

6  with what we own and what we have in bank accounts,

7  150,000.

8          Q.    Not counting the incident on May 12,

9  2017, have you ever taken off your name tag and given

10 it to a person while you were on duty?

11         A.    Yes.

12         Q.    And could you describe that other

13 situation for us?

14         A.    As memory serves me, there was a moment

15 in time earlier on in my career where a woman who I

16 had issued a traffic citation to insisted that I give

17 her my badge.  Well, as Pennsylvania State Troopers,

18 we don't wear badges on our person; so, I gave her my

19 name tag.

20         Q.    Okay.  Was she upset about the traffic

21 stop?

22         A.    Yes.

23         Q.    And you gave her your name tag so she

24 would know your name to do whatever she was going to

25 do with it?

1      A.      And appease her.

2      Q.      Has anyone ever filed a civil complaint

3  against you before for violating their constitutional

4  rights?

5      A.      I want to say no because I don't recall

6  that.

7      Q.      Okay.  Have you ever been reprimanded

8  by your commanding officer during your career as a

9  State Trooper?

10     A.      Sure.

11     Q.      Could you describe how many times you

12  have been reprimanded?

13     A.      A handful.

14     Q.      And that's over your entire 23-year

15  career?

16     A.      Sure.

17     Q.      And do you remember specifically what

18  any of those reprimands would have been for?

19     A.      Specifically, get your paperwork in

20  quicker.

21     Q.      Okay.  So, it would have been something

22  minor like that?

23     A.      Yes.

24     Q.      Have you ever been reprimanded based on

25  a use of force before in the line of duty?

51

1       A.      Reprimanded on a use of force, not that

2   I recall, no.

3       Q.      Have you ever had to use force before

4   in the line of duty?

5       A.      Absolutely.

6       Q.      About how many times do you estimate

7   that you have had to use some level of force?

8       A.      Too many to count.  If you are going to

9   characterize the question using the phrase some level

10  of force, we have an array of force that we use, too

11  many times to count.

12      Q.      Have you ever used deadly force in the

13  line of duty, sir?

14      A.      Not against a person.

15      Q.      Okay.  Have you ever used your taser

16  against somebody in the line of duty?

17      A.      Yes.

18      Q.      About how many times do you think you

19  have had to deploy your taser?

20      A.      Somewhere between three to six times

21  but definitely less than a dozen times.

22      Q.      Okay.  Have you ever had to deploy mace

23  or pepper spray in the course of your duty?

24      A.      I don't recall ever applying mace.

25      Q.      Okay.  Have you ever had to use a baton

**KEYSTONE COURT REPORTING AGENCY, INC.**

52

1    during the course of your duty?

2         A.    Not upon a person, not while working

3    but while training I had to apply my baton.

4         Q.    Okay.   Are you aware of any complaints

5    that have ever been lodged against you based on your

6    conduct as a Pennsylvania State Police Trooper?

7         A.    As memory serves me here today, nothing

8    jumps out another me.   If anybody was able to produce

9    one such complaint, I wouldn't be surprised.

10        Q.    Okay.   How many arrests do you think

11   you have made in your career?

12        A.    I am sorry, I am going to respond by

13   saying too many to count.   I don't keep track,

14   accurate track of how many arrests I have made.

15        Q.    Do you recall about how many

16   arraignments you have been to like you were at with

17   Mr. Bennett on May 12th?

18        A.    That is such a routine occurrence that

19   I don't have an answer for you.

20        Q.    Okay.   So, have you done many

21   arraignments?

22        A.    Yes.

23        Q.    In your experience, about how long does

24   an arraignment take?

25        A.    If a courtroom is not backed up, an

**KEYSTONE COURT REPORTING AGENCY, INC.**

53

1    arraignment can take less than an hour, it could take

2    a half hour.  If we are lucky, it occurs faster than

3    that.

4         Q.    Okay.  During your career as a police

5    officer, have you ever had to use an open-handed

6    strike like you used on Mr. Bennett before on a

7    person?

8         A.    I am sure I have had to; nothing jumps

9    out in my memory.

10        Q.    So, you wouldn't recall how many times?

11        A.    No.

12        Q.    Okay.  During your career as a State

13   Trooper, can you recall ever using the restraint

14   about the chest or neck area that you used on Mr.

15   Bennett previously?

16        A.    That level of force and than manner of

17   technique is applied routinely.  Do I recall any

18   particular instance, no.

19        Q.    And why do you say that it is used

20   routinely?

21        A.    Because restraining an individual in

22   the line of my job is something I am called to do.

23   Even if I am assisting another department to do so,

24   it is routine.

25        Q.    Okay.  So, it is routine that you would

**KEYSTONE COURT REPORTING AGENCY, INC.**

54

1    -- that you have to restrain people, obviously, in

2    the line of duty, right?

3            A.    Yes, yes.

4                  MR. GRYSKEWICZ:  If I could have a

5        moment with my client?

6                        (At this time there was a brief

7                         recess taken.)

8                  MR. GRYSKEWICZ:  I don't have any

9        further questions.

10                 MR. RONGAUS:  I have no questions.

11                 MR. COLEMAN:  I have no questions

12       of Trooper Lopez.  Thank you, sir.

13

14                       (At this time the deposition

15                        in the above-captioned matter

16                        was concluded.)

17

18

19

20

21

22

23

24

25

**KEYSTONE COURT REPORTING AGENCY, INC.**

## C E R T I F I C A T E

    I, Teresa Crossin, a Notary Public in and for Luzerne County, Pennsylvania, do hereby certify that the deposition was reported in machine shorthand by me, that the said witness was duly sworn/affirmed by me, that the transcript was prepared by me or under my supervision and constitutes a complete and accurate record of same.

    I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

TERESA CROSSIN
KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PENNSYLVANIA 18507