# EXHIBIT 2-4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN J. BENNETT, Plaintiff | ) | CIVIL ACTION - LAW |
| -vs- | ) | |
| TROOPER JAIME LOPEZ and TROOPER GABRIEL L. PADUCK, Defendants | x | No. 3:17-cv-02031-ARC |

DEPOSITION TESTIMONY OF

**TROOPER GABRIEL L. PADUCK**

FRIDAY, MARCH 1, 2019

OFFICE OF THE ATTORNEY GENERAL
417 LACKAWANNA AVENUE - SUITE 203
SCRANTON, PENNSYLVANIA

TERESA A. CROSSIN, RMR
NOTARY PUBLIC

**KEYSTONE COURT REPORTING AGENCY, INC.**
**4099 BIRNEY AVENUE, SUITE 9**
**MOOSIC, PA 18507**
**(570) 558-3011 (800) 570-3773**
**FAX (570) 558-3014**



**COUNSEL PRESENT:**

**On behalf of the Plaintiff:**
LAMPMAN LAW
BY: LEONARD GRYSKEWICZ, JR., ESQ.
2 Public Square
Wilkes-Barre, PA 18701

**On behalf of the Defendant Lopez:**
HARRY T. COLEMAN, ESQ.
41 North Main Street
Carbondale, PA 18407

**On behalf of the Defendant Paduck:**
PENNSYLVANIA STATE POLICE
BY: ANDREW M. RONGAUS, Asst. Gen. Counsel
Office of Chief Counsel
1800 Elmerton Avenue
Harrisburg, PA 17110

**STIPULATIONS**

It was stipulated and agreed by and between counsel that the reading, signing, sealing and filing of the deposition transcript be waived.

It was further agreed that all objections except as to the form of the question will be reserved until the time of trial.

**INDEX OF WITNESSES**


| EXAMINATION | PAGE NUMBER |
|---|---|
| TROOPER GABRIEL L. PADUCK | |
| By Mr. Gryskewicz. . . . . . . . . . . . . . . . . . | 3 |
| By Mr. Coleman. . . . . . . . . . . . . . . . . . . . | 37 |
| By Mr. Rongaus. . . . . . . . . . . . . . . . . . . . | 44 |
| By Mr. Gryskewicz. . . . . . . . . . . . . . . . . . | 46 |

**TROOPER GABRIEL L. PADUCK,**

WAS CALLED, AND HAVING BEEN DULY SWORN,

WAS EXAMINED AND TESTIFIED AS FOLLOWS:

**EXAMINATION BY MR. GRYSKEWICZ:**

Q. Trooper Paduck, I am going to give you the same instructions. My name is Lenny Gryskewicz. I represent Mr. Bennett in this action.

Have you ever been deposed before, sir?

A. No, I have not.

Q. Okay. So, I am going to give you some ground rules. I am sure your attorney went over them with you.

I will be asking you questions today regarding an incident that happened on May 12, 2017, in Judge Plummer's magisterial district courtroom that is the subject of this case. My intent is not to harass you, embarrass you, or annoy you with questions, it is simply to learn what you know.

I am sure I am going to ask an unartfully worded question throughout this deposition. If you don't understand what I am asking, please ask me to rephrase the question or tell me you don't understand it, I will rephrase the question.

Please give verbal answers to all of your questions so the stenographer can accurately take down the record. I would ask that you wait until I finish asking my question before you answer and I will provide you the same courtesy and wait until you finish answering to provide my next question.

If at any time you need a break, please let me know, we can take a break. I would just ask that you answer any question currently posed to you before we start the break.

All right. Do you have any questions about that, sir?

A. No, I do not.

Q. All right. What is the highest level of education you have obtained?

A. High school and then some college.

Q. And where did you go to college at?

A. Luzerne County Community College.

Q. Do you know about how many years you went there?

A. Three semesters, so, approximately, a year and a half.

Q. What did you study when you were there?

A. Nuclear engineering technology.

Q. What did you do for employment before you became a police officer?

A. State Trooper or police officer, in general?

Q. Police officer, in general.

A. Well, I became a police officer when I was 18 years old.

Q. So, being a police officer was your first real job?

A. Correct.

Q. Do you remember what year it was when you first became a police officer?

A. I graduated the Act 120 from Lackawanna County College in the beginning of 2009, end of 2008. I believe it was January of 2009.

Q. Where were you a police officer before you became a State Trooper?

A. Jackson Township and Dallas Borough.

Q. About how long were you a local police officer?

A. Approximately four, four and a half years.

Q. When did you attend the Pennsylvania State Police Academy?

A. Well, I started the 137th cadet class

in August of 2013, completed 12 weeks there, and was sent home due to an injury to my ankle. And I went back in the very next class on January 6th of 2014.

Q. You completed it then with the January 6th of 2014 class?

A. That's correct. I graduated in July of 2014.

Q. And could you describe the training that you underwent to become a Pennsylvania State Trooper?

A. It is a 27-week program where you are taught traffic law, crimes code, use of force, police skills, such as proper search and seizure techniques, entry buildings, firearms, physical fitness, a vast array of things.

Q. And you stay at the place you are doing the academy, correct, for those 27 weeks?

A. That is correct. You are given some weekends to go home. It averages out to be approximately every other, every third weekend.

Q. And you have requirements to undergo new training every year, correct?

A. That's correct.

Q. Could you describe what those requirements are?

A. Yes, we have our PSP legal updates, which some of which is now done via Power Point. And then we also have our mandatory inservice training, which is something that you attend in person eight hours annually.

Q. And when was the last time you underwent this training?

A. Well, I just completed the legal updates Power Point, approximately an hour and a half of training. That was the end of January this year I completed that. And then the actual inservice training which we attend will be scheduled some time throughout the year.

Q. Out of curiosity, what did they go over with you in the legal updates?

A. In the Power Point?

Q. Yes.

A. Everything, all new laws that changed, gradings that have changed. It is a lot of case law to get you up to speed on everything.

Q. When was the last time you underwent training before May 12, 2017?

A. Before May 12, 2017?

Q. Yes, sir.

A. I could not tell you.

Q. You don't remember?

A. I have no idea.

Q. But it is safe to assume that you did your annual training in 2017?

A. That is correct.

Q. How long were you stationed in Troop P in Tunkhannock?

A. I have been in Troop P since graduating. Tunkhannock, I was stationed there from June -- I want to say June 20, 2016, until September 9, 2017.

Q. Where are you stationed now, sir?

A. I am currently stationed in Shickshinny, Troop P.

Q. How long did you work with Trooper Jaime Lopez?

A. The entire time I was in Tunkhannock, for the most part.

Q. You were partners with Trooper Lopez?

A. I was.

Q. And what shift did you and Trooper Lopez normally work?

A. Well, we were one of the permanent midnight crews, as they call us, so, we would work a ten-day stretch. Out of those ten days, you worked

seven overnight midnight shifts and then three either a.m. dayshifts or p.m. afternoon shift.

Q. Okay. Were you ever involved in a lawsuit before?

A. I was not, no.

Q. Okay. So, you were never a witness, never a Plaintiff or Defendant?

A. No, sir.

Q. Okay. How many times do you estimate that you were in Judge Plummer's courtroom before May 12, 2017?

A. I have no idea, sir, numerous.

Q. So, you are very familiar with the courtroom?

A. Yes, sir.

Q. Did you know Steven Bennett prior to May 12, 2017?

A. Yes, I was familiar with who he was.

Q. Could you describe to me how you knew him?

A. Mr. Bennett actually graduated, I believe, two years ahead of me in high school; so, I knew who he was from seeing him at school. And he was also a Wyoming County corrections officer, so I would see him occasionally dropping off prisoners.

Q. Did you knowing Mr. Bennett prior to May 12, 2017, affect how you acted that day in any way?

A. No.

Q. When did you arrive at the Tunkhannock PSP barracks on May 12, 2017?

A. Sometime between 8:00 p.m. and 9:00 p.m.

Q. What was the normal time you were supposed to go in to work?

A. 10:00 p.m.

Q. Why did you get called in early that day?

A. I believe we had a murder suicide in the Nicholson area on that day, so, everybody was there. Once incidents started coming, they called us to come in early to assist.

Q. What were you doing before you got called in to work?

A. Honestly, I don't know. I believe watching a movie with my now wife.

Q. Did you have any alcoholic beverages to drink before you went in to work?

A. No.

Q. When you arrived at the Tunkhannock

Pennsylvania State Police barracks, Mr. Bennett was already in custody there, correct?

A. That's correct.

Q. And could you describe how Mr. Bennett was restrained when you got to the barracks?

A. He was seated on the prisoner bench in the patrol room, as Trooper Lopez described. He was handcuffed in front and I believe the ankle shackle was also cuffed to his handcuffs.

Q. And I know you said as Trooper Lopez described. For the record here, let's just assume that we haven't done Trooper Lopez' deposition, that's why I am asking you some repeat questions that I am sure are going to be the same. Just for the record, I have to ask you the same questions. So, I would ask you to answer based on your knowledge and if you know something else, feel free to add it.

The way Mr. Bennett was restrained to the bench when you got to the PSP barracks, is that the normal way that prisoners or people in custody are restrained when they are taken to your barracks?

A. Yes.

Q. At some point Trooper Levanavage asked you and Trooper Lopez to transport Mr. Bennett to his preliminary arraignment, right?

A. That's correct.

Q. Okay. Did you change the way Mr. Bennett was restrained to take him to the arraignment?

A. I do not recall who did it. I am sure I was present when it happened. I couldn't tell you with 100 percent certainty whether I put the belt on him, Trooper Levanavage put the belt on him or Trooper Lopez did.

Q. Understood. So, could you describe how Mr. Bennett was restrained in order to transport him to the preliminary arraignment?

A. Yes. I would imagine it was leather then. We have leather and a fabric, like a nylon transport belt. I believe a leather transport belt was placed around his waist and then one handcuff is attached to his wrist, the other open handcuff is placed through a D-ring and then attached to the other wrist.

Q. And is that the normal way that prisoners or individuals in custody are restrained when they are transported?

A. If they are leaving the barracks and then going somewhere, yes, that's generally what we do just out of comfort for the individual. But if

you don't have a transport belt to use, then they are handcuffed behind the back.

Q. Okay. Why was it decided that a transport belt would be used on Mr. Bennett that night?

A. Because one was readily available.

Q. Once Mr. Bennett was placed in the transport belt and handcuffed, were those restraints ever removed from him from the time you left the Pennsylvania State Police barracks until he was lodged at the Wyoming County Prison that night?

A. I believe when -- I believe it was altered when Mr. Bennett was in the ambulance.

Q. Okay. So, beyond when Mr. Bennett was receiving medical treatment that night, did you change the restraints that were on Mr. Bennett at all?

A. I don't believe so. Every now and then we may remove one handcuff for the Defendant to sign paperwork. Usually, we do not, though, because you are still able to get your hands up and sign. So, honestly, I do not recall whether or not it was ever changed before medical attention was provided.

Q. Do you recall freeing one of Mr. Bennett's hands for him to sign paperwork that night?

A. I do not, no.

Q. And then you and Trooper Lopez then transported Mr. Bennett from the Pennsylvania State Police barracks to Judge Plummer's courtroom, correct?

A. Correct.

Q. You would agree that you had no problems with Mr. Bennett while he was being transported from the barracks to the magisterial court?

A. Yes, I would say that.

Q. Okay. When you first arrived at the magisterial court, where did you take Mr. Bennett?

A. I believe I walked Mr. Bennett in and sat him at the Defendant's table.

Q. While you were waiting for the Judge, did you have any problems with Mr. Bennett?

A. No, I did not have any problems with him.

Q. Okay. What did you and Mr. Bennett speak about while you were waiting for Judge Plummer to come out?

A. I know I told Mr. Bennett to relax and not get emotional the way he did at the barracks in our presence, because I told him that is going to do

nothing but upset the Judge. There may have been some other small talk, but I couldn't tell you exactly what we spoke about.

Q. Would you agree with me that you told the Pennsylvania State Police internal affairs investigators that Judge Plummer began screaming at Mr. Bennett after he came out of his office?

A. Not immediately but that did transpire, yes.

Q. Okay. And how long do you believe that transpired for?

A. Not very long; I mean, I would say Judge Plummer yelled at Mr. Bennett numerous times, but as soon as he yelled, he then calmed down.

Q. How would you characterize the interactions between Judge Plummer and Mr. Bennett that night?

A. At first, I would say he was very typical and normal. But throughout, I would say it got tense between the two of them.

Q. At some point during Mr. Bennett's interactions with Judge Plummer, you walked over and stood next to Mr. Bennett, right?

A. I believe so.

Q. Do you remember why you walked over and

stood next to Mr. Bennett?

A. I do not. I would have to see at what point this occurred, whether it was to assist with paperwork, I couldn't tell you.

Q. Okay. Do you recall Mr. Bennett standing up at the Defendant's table while he was speaking to Judge Plummer?

A. Not offhand, but there is video, so, if he did, then I am sure it happened.

Q. Okay. But it is your testimony right now that you don't necessarily recall that off the top of your head?

A. Yes. There are several facts that I can honestly say that I do not recall every instance of what transpired.

Q. Understood. Would you agree that Mr. Bennett was leaning forward towards Judge Plummer at various times throughout the arraignment?

A. Yes.

Q. Would you agree that you were standing next to Mr. Bennett when Trooper Lopez first placed his left hand on Mr. Bennett's shoulder?

A. I believe I was.

Q. Okay. And then would you agree that Trooper Lopez then kind of leaned in front of you

when he placed his right hand on Mr. Bennett's shoulder and chest area?

A. Yes.

Q. And then you walked to the front of the Defendant's table by Judge Plummer, right?

A. I believe so, yes.

Q. Okay. Do you remember why you kind of got out of the way there and left that area?

A. Well, if anything occurred, there is nothing I could do standing behind him and nothing I could see.

Q. So, was the position in the front of the table a better vantage point for you?

A. Yes, to see what is actually occurring, yes.

Q. And I believe you previously stated that you did not actually see Trooper Lopez strike Mr. Bennett, is that right?

A. That's correct.

Q. Do you recall what you were doing when Trooper Lopez did strike Mr. Bennett?

A. Yes, after all the paperwork was presented to Mr. Bennett, I reached under my tie, pulled out a pen and held it there for Mr. Bennett to use to sign. It was apparent that he was not going

to sign and that's when I took my pen, looked down and placed it back under my tie and that's when I heard the noise.

Q. So, you heard Trooper Lopez strike Mr. Bennett?

A. Correct.

Q. Could you describe what it sounded like for us?

A. Sounded like somebody getting slapped, skin on skin contact.

Q. Was it loud?

A. I wouldn't say it was necessarily loud but I was able to hear it.

Q. Do you recall if Trooper Lopez made any sounds when he struck Mr. Bennett?

A. I don't believe he made any sound, other than speaking.

Q. Do you recall if Mr. Bennett made any noises when he was struck by Trooper Lopez?

A. I know he had things to say right after it happened but, no, I don't remember anything as it happened.

Q. Would you agree that you also didn't see what happened in the few seconds prior to Trooper Lopez striking Mr. Bennett?

A. I would somewhat agree with that, yes.

Q. So, what is the last thing you remember seeing prior to Trooper Lopez striking Mr. Bennett?

A. The last thing I remember is Trooper Lopez placing his hands out telling Mr. Bennett don't go any closer to the Judge. I remember him putting his next hand out after Mr. Bennett leaned forward again and Trooper Lopez again said don't go any closer to the Judge. And I believe at that point I saw Mr. Bennett look over at Trooper Lopez and then stare at the Judge again and try to lean forward. And that's when I said it is time to put my pen away.

Q. After you heard the slap, did you immediately look up?

A. I would imagine, yes.

Q. So, did you observe Trooper Lopez grab Mr. Bennett by his neck, chest area?

A. Yes.

Q. And restrain him, okay. Did you observe the beginning of that?

A. I believe so.

Q. And then would you agree with me that after Trooper Lopez grabbed Mr. Bennett by his neck or chest area, you walked towards Trooper Lopez?

A. I would.

Q. Why did you approach Trooper Lopez at that time?

A. Just in case I was needed to do anything.

Q. And then would you agree with me that you stood by Trooper Lopez while he was restraining Mr. Bennett?

A. I believe so.

Q. For a few moments?

A. Okay.

Q. You only watched during this time, right?

A. Correct.

Q. Did you say anything during this time?

A. I could not recall.

Q. Okay. Do you remember attempting to help Trooper Lopez in any way?

A. No, he didn't need any help.

Q. Okay. And then after a few moments, you would agree that you walked back to the front of the Defendant's table while Trooper Lopez was continuing to restrain Mr. Bennett?

A. I believe so.

Q. Okay. Do you remember why you walked back to the front of the table at that point?

A. To collect all the paperwork that the Judge had for Mr. Bennett.

Q. Okay. So, in the video, it appears you were looking at papers on the table then; would you agree with that?

A. I believe so, yes.

Q. So, would that paperwork be the paperwork from the arraignment, most likely?

A. Yes, it would.

Q. So, at that time why did you make the decision to collect the paperwork versus watch your partner or Mr. Bennett at that time?

A. Because at that time I felt my partner had things under control.

Q. Did you speak with Judge Plummer at all at this time?

A. Not that I can recall, other than the Judge saying here is all of his paperwork.

Q. Would you agree Judge Plummer never really reacted to the interaction between Trooper Lopez and Mr. Bennett?

A. Honestly, I couldn't tell you. I wasn't focused on Judge Plummer when this was occurring.

Q. Did you see Trooper Lopez release Mr.

Bennett?

A. I believe I did.

Q. How long do you believe that the restraint Trooper Lopez used on Mr. Bennett lasted?

A. Seconds. I couldn't tell you for sure. I believe Trooper Lopez already said 23 seconds, but that's -- that would just be from him saying that.

Q. Would you agree with me that if you believed you had a duty to intervene you would have had time and opportunity to do so?

A. Possibly.

Q. Do you remember what Trooper Lopez was saying to Mr. Bennett after he released him?

A. I just recall Trooper Lopez telling him to calm down and relax.

Q. Do you recall what Mr. Bennett was saying at that time?

A. Yes, at that time Mr. Bennett was screaming you just hit me, you just hit me. I am in restraints, typical PSP.

Q. And about how long do you estimate that, you know, that whole interaction, the verbal interaction between Trooper Lopez and Mr. Bennett lasted?

A. That occurred the entire time that

Trooper Lopez was restraining Mr. Bennett telling him to calm down, relax.

Q. Would you agree with me that there was never a verbal argument between Mr. Bennett and Trooper Lopez prior to Trooper Lopez' use of force?

A. I would have to agree, yes.

Q. After Trooper Lopez used force against Mr. Bennett, did you examine Mr. Bennett for any injuries in the courtroom?

A. I didn't observe any injuries, no.

Q. Did you look for any injuries, though?

A. I looked at him but I can't say I pulled him aside and assessed him.

Q. Did you ask Mr. Bennett if he was injured in any way in the courtroom?

A. In the courtroom, no, I did not.

Q. To your knowledge, did Trooper Lopez ask Mr. Bennett if he was injured in the courtroom?

A. I don't know.

Q. After a few more moments then you would agree that Trooper Lopez ordered Mr. Bennett to stand up and leave the courtroom, is that right?

A. I believe so.

Q. Would you agree that Mr. Bennett obeyed Trooper Lopez' command to stand up?

A. From what I recall, yes.

Q. And, to your knowledge, do you believe Trooper Lopez had to use any force on Mr. Bennett to get him to leave the courtroom?

A. I believe Trooper Lopez had to grab Mr. Bennett and turn him around to truly start leaving, but that was the extent of it.

Q. Okay. And then you followed Mr. Bennett and Trooper Lopez out of the courtroom, correct?

A. From what I recall, yes.

Q. And about how far do you think you were behind them once you left the courtroom?

A. Once we left the courtroom, I would say I was probably right alongside them, if not in front of them, to open the door for them.

Q. And could you describe for us what Judge Plummer's office looks like outside of the courtroom?

A. Yes, as soon as you exit the courtroom, you are in a hallway, there is, I believe, a small little conference room directly ahead of you. If you turn right and walk down that hallway, there is another small conference room, there is a bathroom on your right, and then you enter the waiting area, the

lobby area, and then the staff office would be to your right. There is a wall with chairs to your left and then the door.

Q. And as Trooper Lopez was escorting Mr. Bennett out of Judge Plummer's office to the police cruiser, did you observe any interactions between the two of them?

A. At some point I do recall Trooper Lopez pulling on the transport bell and telling Mr. Bennett not to pull him.

Q. And do you recall stating to the Pennsylvania State Police internal affairs that Trooper Lopez ended up putting his foot down and yank on the belt and said quit pulling me?

A. Yes.

Q. At what point did you find out there was a camera in the courtroom?

A. When it was brought to my attention, I believe, during the internal affairs interview.

Q. So, you didn't know there was a camera in the courtroom that night?

A. No, I did not.

Q. You called Corporal Mitchell when you exited Judge Plummer's office that night, right?

A. At some point I believe he was

contacted once we got to the hospital.

Q. Okay.

A. It could have been a little bit sooner. I know I did call him.

Q. Do you remember what you told Corporal Mitchell that night?

A. Yes, I advised him that we were either already at the hospital or en route to the hospital and gave him a brief rundown of what had occurred in Judge Plummer's office.

Q. During Corporal Mitchell's interview with the Pennsylvania State Police internal affairs, he stated that you told him that Mr. Bennett lunged at Judge Plummer and that is why Trooper Lopez used force. Is that an accurate recitation of what you told Corporal Mitchell that night?

A. It could be. I believe the words I used were leaned towards the Judge.

Q. So, you don't necessarily remember using the word "lunge"?

A. I do not. I very well could have, but this was almost two years ago, so.

Q. Would you agree with me that Mr. Bennett didn't lunge at Judge Plummer?

MR. COLEMAN: Note my objection.

You could answer, Trooper.

THE WITNESS: I would say he definitely moved towards the Judge, so, yeah, I guess you could classify that as a lunge.

BY MR. GRYSKEWICZ:

Q. When you got to the patrol vehicle, could you tell us what happened?

A. Trooper Lopez and I placed Mr. Bennett in the passenger side rear seat of the police vehicle.

Q. Okay.

A. I believe I was on the passenger side with Mr. Bennett and I believe Trooper Lopez went to the driver's side to grab the seat belt to fasten the seat belt.

Q. Okay. And at this point when you placed Mr. Bennett in the patrol vehicle, do you remember that he started to complain his jaw hurt?

A. I do not remember him complaining of his hurt jaw at that time.

Q. Okay. Do you remember him complaining of any type of injuries or ailments?

A. I remember he began to hyperventilate and started yelling, I need Tyler.

Q. Okay. And I need Tyler, to your understanding, does that mean Tyler Memorial Hospital?

A. That's what I assumed, yes.

Q. And that after Mr. Bennett began to hyperventilate, is that when Trooper Lopez called the ambulance?

A. That's correct.

Q. And did you observe Mr. Bennett hyperventilating in the vehicle?

A. Yes, I turned around and looked at him.

Q. Could you tell me what he looked like at that time?

A. I would say he was very frustrated and breathing very heavily.

Q. About how long do you believe it took the ambulance to arrive on scene?

A. 5 to 10 minutes. It wasn't a long period of time.

Q. And did you have any input in the decision to call an ambulance versus take Mr. Bennett to the hospital yourselves?

A. I believe we just decided to call an ambulance.

Q. And I know you said we decided, did you

and Trooper Lopez discuss calling an ambulance or is it just what you two did at that time?

A. I honestly don't recall what kind of discussion there was. I am sure we did discuss something about it, but that's what was done.

Q. When the ambulance personnel arrived, do you remember talking to anybody?

A. Oh, I am sure I did.

Q. Do you remember what you said to any of the EMTs about what was happening?

A. Verbatim, no, I do not.

Q. Did you ride in the ambulance with Mr. Bennett to the hospital?

A. Yes, I believe so.

Q. And why did you ride in the ambulance with him?

A. Because at that point he was still a prisoner.

Q. So, it is a requirement that a police officer accompany somebody in the ambulance?

A. Right.

Q. And on the ride to the hospital in the ambulance, what occurred inside of the ambulance?

A. He was treated by EMS personnel. And by treated, I don't recall if they gave him an ice

pack in the ambulance or if that wasn't until we got to the hospital. I do not recall.

Q. And did they give him a paper bag or anything like that?

A. I don't believe so.

Q. What happened when the ambulance arrived at the hospital?

A. We would have got Mr. Bennett out of the back seat and escorted him to the ambulance with EMS personnel.

Q. And did you accompany Mr. Bennett the entire time he was in the hospital?

A. For the most part, yes, myself and I believe Officer Bukavage were in the emergency room just outside of his room the entire time.

Q. Did you observe any interactions between Mr. Bennett and the doctor?

A. No, not that I recall.

Q. Do you remember observing any interactions between Mr. Bennett and the nurses at the hospital?

A. Well, yeah, I remember them speaking to him. I couldn't tell you what was said.

Q. Okay. Do you remember if they gave him anything at the hospital?

A. I don't; possibly a Tylenol or an Advil.

Q. You said at some point he was given an ice pack, correct, I guess?

A. Yes, I recall him sitting on the bed holding the ice pack on his cheek.

Q. And do you recall if he was still handcuffed at that point with the ice pack?

A. I do not recall. I would believe at least one of his hands were taken out of the handcuffs at that point. To be honest, they may have both been taken off at that point for any sort of medical evaluation. But, like I said, either myself or Officer Bukavage were standing there the whole time.

Q. About how long do you estimate Mr. Bennett was in the hospital?

A. Honestly, I couldn't tell you. I know it wasn't extremely long, as long as it took for a doctor to examine him and say that there were no injuries.

Q. While Mr. Bennett was in the hospital, did you have any problems with him?

A. Me, personally, no.

Q. Did you have any problems with Mr.

Bennett while he was being transported to the hospital in the ambulance?

A. I did not.

Q. After being discharged from Tyler Memorial, you took Mr. Bennett to the Wyoming County Correctional Facility, right?

A. That is correct.

Q. How did you transport Mr. Bennett to the Wyoming County Prison?

A. Mr. Bennett was transported in Tunkhannock Borough's police car, which was a cage car, I recall. Mr. Bennett was seated in the back behind the passenger seat. I rode passenger and Officer Bukavage from Tunkhannock Borough was driving.

Q. Did you or Officer Bukavage have any problems with Mr. Bennett on the way to the prison?

A. No.

Q. How did you come into possession of Trooper Lopez' name tag that night?

A. He gave it to me and told me to give it to the jail along with Mr. Bennett's personnel belongs.

Q. You said he, do you mean Mr. Bennett or Trooper Lopez?

A. Trooper Lopez gave it to me at some point throughout the night.

Q. Do you know how Trooper Lopez came in possession of it?

A. Of his name tag?

Q. Yes.

A. Well, he took it off his shirt.

Q. Did you see Trooper Lopez give his name tag to Mr. Bennett at all that night?

A. I don't recall that. Apparently, it happened, but I personally don't recall it.

Q. So, you just assume Trooper Lopez had his name tag the entire night?

A. I did, yes.

Q. And then I believe you testified that you gave the name tag to the prison because Trooper Lopez asked you to?

A. Correct.

Q. Have you ever taken off your name tag and given it to somebody before during the course of your duty?

A. I have not.

Q. I think I know the answer because you said you didn't see it. Do you know what Trooper Lopez says to Mr. Bennett when he gave him his name

tag?

A. I have no idea.

Q. Not counting May 12, 2017, have you ever seen Trooper Lopez take off his name tag and give it to somebody before?

A. Permanently, no.

Q. Has anyone ever filed a complaint against you before for violating their constitutional rights?

A. Not that I am aware of, no.

Q. Have you ever been the subject of a Pennsylvania State Police internal affairs investigation before?

A. No, I have not.

Q. Have you ever been reprimanded by your commanding officer before?

A. Possibly received a supervisor's notation for a late supplemental, but that would be the extent of it.

Q. Do you recall how many times that might have happened?

A. Once.

Q. Have complaints ever been lodged against you based on your conduct as a Pennsylvania State Police Trooper before?

A. Not that I am aware of.

Q. How many arrests do you think you have made in your career?

A. Too many to count.

Q. And are transporting prisoners to arraignments part of your everyday job as a Pennsylvania State Police Trooper?

A. Yes, sir.

Q. Have you ever had to use force against an individual in a courtroom before?

A. Not that I can recall, no.

Q. I am going to preface these questions with the same thing I did for Trooper Lopez. It is not my intent to annoy or harass you or embarrass you with this but part of the way that punitive damages can be calculated in a federal lawsuit, if they are awarded, is based on your income, your net worth. So, sir, how much --

MR. RONGAUS: Just note my objection, since the State Police would be indemnifying any --

MR. GRYSKEWICZ: I understand your objection.

MR. RONGAUS: You can answer. I am just saying note my objection.

BY MR. GRYSKEWICZ:

Q. How much do you make a year as a State Trooper?

A. Base salary, honestly, I couldn't tell you. With shift differential and overtime, last for 2018 I believe my gross total before tax was 83,000.

Q. And what do you estimate your net worth to be, sir?

A. I have no idea.

Q. In your career, have you ever had to intervene to stop another police officer from using improper force against someone?

A. No.

Q. Have you ever used deadly force against somebody in your career?

A. No.

Q. Have you ever used your taser against somebody during your career?

A. No, I don't believe so.

Q. Have you ever had to use a baton against someone during your career?

A. Only in training.

Q. Have you ever struck somebody with an open hand during your career?

A. Not that I can specifically recall, no.

Q. Have you ever restrained somebody as Trooper Lopez restrained Mr. Bennett on May 12, 2017?

A. Possibly.

Q. But do you remember any specific incidents?

A. Not anything specific, no.

MR. GRYSKEWICZ: And if I could have a moment with my client.

(At this time there was a brief recess taken.)

MR. GRYSKEWICZ: I have no further questions.

MR. COLEMAN: I just have a couple, if I may.

**EXAMINATION BY MR. COLEMAN:**

Q. Trooper, you were interviewed as part of the Pennsylvania State Police internal investigation report, correct?

A. Correct.

Q. And it is my understanding that that interview took place on September 12th of 2017 and at that time you were assigned to the State Police Shickshinny criminal investigative unit, is that correct?

A. That's correct.

Q. When you were interviewed, I believe it was possibly Trooper Gilhooley and there was a Mr. Buczynski or Trooper Buczynski that may have interviewed you. Were you under oath at the time of your interview, if you recall?

A. I do not recall.

Q. I am going to ask you a couple of questions from this. I am on Page 90 of the report. I am going to read the paragraph verbatim and ask you a question.

During the interview, Trooper Paduck provided the following information in regards to this investigation. Trooper Paduck indicated it became very tense between Bennett and Plummer right from the beginning of the arraignment. There was a lot of arguing between Bennett and Plummer. Trooper Paduck indicated he heard Trooper Lopez tell Bennett not to move any closer to the Judge two times. Trooper Paduck related he did not see the slap. Quote, I hear a loud noise and then I look up and there is Mr. Bennett screaming you just hit me, you just hit me, close quote. Trooper Paduck then stated Bennett, quote, started going crazy and that's when Trooper Lopez grabbed him and said you need to settle down.

You know, I told you not to go towards the Judge.

Is that a fair summary of the interview you provided to the State Police internal investigation unit?

A. Yes, I believe so.

Q. Okay. I am going to go through just a couple of sections of the interview and if I reference Gilhooley, that's the interviewer, and then I will give you your answer.

A. Okay.

Q. I am on Page 95 of the report. The question by Gilhooley and a direct quote, Did his demeanor change at all? Did he have any time to sit there calmly waiting for you two? Your answer: He was calm at first. Like I explained, he was sitting at the Defendant's table.

Gilhooley: This is once you are at the Magistrate's? Your answer: Once we were, yeah. So, on the transport he was fine. It is only a 30-second drive from our barracks to Plummer's. Once we got him inside, I explained to him, you know, listen, just relax. Be quiet. Don't give the Judge any attitude. You don't want to make things worse for yourself.

Gilhooley then questioned: The reason

that you were saying this was -- did he give you reason to believe that he may not act that way? And your response on the top of Page 96: Yes, just based on his overall demeanor and the way he was acting in the barracks and the way he was yelling, I told him, you know, listen, just try to relax. Don't treat the Judge like you were treating us because it is not going to go well.

Gilhooley then says: Okay. And you said: And sure enough, it happened. And Gilhooley said: So, the Judge entered and -- you answered: Right. I don't recall exactly what was said. I know Steve's response was this is bullshit. I believe he said fuck at some point. And that's when the Judge lost it and started screaming at him. And right after that moment, it was just very tense between the two of them for the entire arraignment.

And Gilhooley said: Okay I am sorry, go ahead, sir. And then Buczynski interposed: That's okay. All right. So continue with what transpired while you were at the Magistrate's office. And your response was: So, the Judge screams at him for a good minute or so. I would say telling him, you know, don't use that language in my courtroom, all that. He is sitting there. He did calm down

after that or at least he pretended to. He kept his mouth shut. Excuse me, the Judge was doing his thing, reading everything, going over the arraignment. Explained to Mr. Bennett what an arraignment is.

He got down to the end of it and basically said, okay, you know, I am committing you to Wyoming County jail in lieu of whatever the bail was, I don't recall, and he started reading all of his conditions. And as soon as he said -- Buczynski: When you say you are talking bail conditions? Your answer: Right, right. As soon as he said you cannot contact her, I remember Mr. Bennett sitting there raising his hand and he kept waving it. And I was just standing on the side of the table and I am watching him do this. So, I said, you know, just wait, just wait one second. You know, don't interrupt the Judge as he doing this, because they already butted heads once. And Buczynski said: Right. And then you continued and you said: So, the Judge finally gets done with his spiel and says, you know, what do you want? What is it? What do you need? And that's when he said, well, is she getting arrested? And he is, like, for what? And he said, well, you said I can't contact her, but she has been

calling me while I was at the barracks. They don't look at my phone, but she was calling me. I know it. And he said, well, no, she is not getting, you know -- why would -- she is not going to jail. You are the one who got arrested. You can't contact her. Nobody says she can't contact you.

And that's when he started screaming with this, well, this is fucking bullshit again. So, then the Judge went off and started screaming at him again and Mr. Bennett just sat there and stared at him and continued to start inching up. And him and the Judge stayed in an argument and the Judge kept yelling at him, you know, don't stare me down, all that nonsense, and he kept sliding forward.

Trooper Lopez put his hand out and said don't go any closer to the Judge. He looked at him, looked back at the Judge, and started sliding forward again. And he said, don't go any closer to the Judge. The Judge was sitting there. He is, like, are you going to sign your conditions or what? So, that is when I am standing there holding my pen out and it is still going on. He is not signing. I hear Trooper Lopez again say don't go any closer to the Judge. And I said, okay, he is not signing.

So, I looked down. I put my pen back

under my tie. And as I am doing that, I hear a loud noise and I look up and there is Mr. Bennett screaming, you just hit me, you just hit me, and he started going crazy. And that's when Trooper Lopez grabbed him and said you need to settle down. You know, I told you not to go towards the Judge.

The Judge was screaming at him, and at that point the Judge handed me all of his paperwork and just said get him out of here.

Do you recall giving that statement?

A. Yes, I do.

MR. GRYSKEWICZ: Could you note my objection.

MR. COLEMAN: I am not done yet.

BY MR. COLEMAN:

Q. Do you recall that interchange that I just read for you from the investigative report from Pages 95 to 97, do you recall giving that statement to the internal affairs?

A. Yes, I do.

MR. GRYSKEWICZ: Note my objection for the record and you are allowed to answer.

MR. COLEMAN: Thank you, I have nothing furthered, Trooper. Thanks so

much.

MR. RONGAUS: Just a couple of questions, Trooper.

**EXAMINATION BY MR. RONGAUS:**

Q. After Trooper Lopez -- after you heard the slap and Mr. Bennett started yelling, what was he yelling, if you recall?

A. I recall him yelling you just hit me, you just hit me. I am in restraints, typical PSP. You will only hit me if I am in restraints. I do not recall exactly what else.

Q. Okay. And then when Trooper Lopez applied the restraint up around his chest and neck area, do you recall if Mr. Bennett said anything at that point?

A. Yes, he was still speaking.

Q. Was Mr. Bennett still speaking and screaming while Trooper Lopez had him in that hold?

A. Yes, from what I recall, yes.

Q. And counsel asked you that at no point did you intervene to stop what was going on; do you recall that question?

A. Yes.

Q. Why? Why didn't you?

A. I wasn't needed to.

Q. And why do you believe that you weren't needed to?

A. Trooper Lopez wasn't doing anything that he couldn't or shouldn't have been doing. He was calming a suspect down, keeping everyone safe.

Q. Was there anything in your mind that led you to believe that Mr. Bennett was in any distress?

A. No.

Q. Was there anything that would have led you to believe that he was being choked in any way?

A. No, he was speaking the entire time that it was occurring.

Q. Why is that important to you?

A. Because you can't be choking if you are speaking.

Q. And after Trooper Lopez finally -- after Mr. Bennett finally calmed down, Trooper Lopez released his hold, at any point while you were still in the courtroom did Mr. Bennett complain of any injury to him?

A. No, he did not.

MR. RONGAUS: I have nothing further, thank you.

MR. GRYSKEWICZ: Just one follow-up question.

**FURTHER EXAMINATION BY MR. GRYSKEWICZ:**

Q. Would you agree with me, Trooper Paduck, that somebody would have to move forward towards the table to sign paperwork?

A. It would depend on where they were seated at the exact time.

Q. Would you agree with me that Mr. Bennett could have been moving closer towards the table and attempt to sign the paperwork prior to the use of force by Trooper Lopez?

MR. COLEMAN: Just note my objection. You could answer.

THE WITNESS: I don't believe so, no. Mr. Bennett was given multiple opportunities to sign and, as I recall, stayed back like this until he stared at the Judge and then started going forward. (Indicating).

MR. RONGAUS: Indicating for the record leaning back in the chair?

THE WITNESS: Correct.

MR. COLEMAN: And then forward.

MR. RONGAUS: And then forward.

THE WITNESS: This was after I believe paperwork was already pulled away. So, at that point there was no reason to go towards the Judge.

MR. GRYSKEWICZ: I have no further questions.

MR. COLEMAN: I have nothing further. Thank you.

MR. RONGAUS: Thank you.

(At this time the deposition in the above-captioned matter was concluded.)

**CERTIFICATE**

I, Teresa Crossin, a Notary Public in and for Luzerne County, Pennsylvania, do hereby certify that the deposition was reported in machine shorthand by me, that the said witness was duly sworn/affirmed by me, that the transcript was prepared by me or under my supervision and constitutes a complete and accurate record of same.

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

TERESA CROSSIN
KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PENNSYLVANIA 18507